OPINIONS OF THE JUSTICES.

OPINION OF THE JUSTICES TO THE SENATE.

*Constitutional Law*, Privileges and immunities. *Commonwealth*, Contract. *Contract*, Public works, Commonwealth.

Proposed legislation which would have mandated that private contractors on State-funded projects in critical unemployment areas employ residents of the Commonwealth in at least eighty per cent of the employment positions covered by a governed contract or subcontract would, if enacted, violate the privileges and immunities clause, art. 4, § 2, cl. 1, of the United States Constitution. [1202-1208]

On October 4, 1984, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit their responses to the questions set forth in an order adopted by the Senate on July 3, 1984, and transmitted to this court on July 25, 1984.[1] The order indicates that there is pending before the General Court a bill printed as Senate No. 2166 entitled, "An Act to increase opportunities for Massachusetts residents on state-funded projects." A copy of the bill was transmitted with the order. The order recites that: "Said bill would require, in part, that during periods of critical unemployment as defined by the commissioner of the division of labor and industries, any contract or subcontract for the provision of services with respect to a state funded project shall provide that at least eighty percent of the employment positions covered

---

[1] We invited interested persons to file briefs on or before August 31, 1984, and we acknowledge the assistance of a brief from the New England Legal Foundation.

by the contract or subcontract go to residents of the common-wealth . . . ."

The order also indicates that grave doubt exists as to the constitutionality of the bill, if enacted into law, and requests our opinion on these questions:

> "1. Would the enactment of said bill which, in part, mandates that private contractors on state funded projects in critical unemployment areas shall employ common-wealth residents in at least eighty percent of the employment positions covered by the contract or subcontract violate the United States Constitution, Art. IV, Sec. 2, cl. 1, or Article XII of part 1 of the Massachusetts Constitution?
>
> "2. Would the enactment of said bill which, in part, mandates that private contractors on state funded projects in critical unemployment areas shall employ common-wealth residents in at least eighty percent of the employment positions covered by the contract or subcontract violate the United States Constitution, Art. 1, Sec. 8, cl. 3?"

We first examine the bill under the privileges and immunities clause (art. 4, § 2, cl. 1) of the United States Constitution: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The terms "citizen" and "resident" are " 'essentially interchangeable' . . . for purposes of analysis of most cases under the . . . Clause . . . ." *Hicklin* v. *Orbeck,* 437 U.S. 518, 524 n.8 (1978). The clause was intended to fuse a collection of independent States into one nation and was designed to ensure that a citizen of one State who ventures into another State is accorded the same privileges enjoyed by the citizens of that State. See *Toomer* v. *Witsell,* 334 U.S. 385, 395 (1948). The pending bill, according to its title, is intended "to increase opportunities for Massachusetts residents on state-funded projects."[2] We are called

---

[2] We assume that the bill is intended, at least in part, to alleviate unemployment because it would take effect only in areas of critical unemployment conditions. We expect that a bill intended merely to increase employment opportunities would not need to be structured as this one is.

upon to determine whether these distinct and significant interests would conflict and, if so, whether our constitutional system requires that one of them be accorded greater weight.

We observe initially that the bill would burden a protected privilege because the opportunity to seek employment with private contractors and subcontractors engaged in public works projects is "sufficiently basic to the livelihood of the Nation" as to be within the scope of the clause. *United Bldg. & Constr. Trades Council* v. *Mayor of Camden,* 465 U.S. 208, 221 (1984), quoting *Baldwin* v. *Montana Fish & Game Comm'n,* 436 U.S. 371, 388 (1978). See *Hicklin* v. *Orbeck,* 437 U.S. 518, 524-525 (1978).

The analytical framework which guides our review under the clause is that established in *Toomer* v. *Witsell, supra,* and later applied in both *Hicklin* v. *Orbeck, supra,* and in *United Bldg. & Constr. Trades Council* v. *Mayor of Camden, supra* at 222-223.[3] The clause bans discrimination against a resident of another State if there is no substantial reason for it other than the fact of citizenship in another State, but it does not prohibit discrimination based upon "perfectly valid independent reasons." *Toomer* v. *Witsell, supra* at 396. "[T]he inquiry . . . must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them." *Id.* The Court, in

---

[3] The court followed this pattern of inquiry in *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston,* 384 Mass. 466, 473-478 (1981), in which the court concluded that a statutory preference for residents for certain positions in hiring on State-funded construction projects conflicted with the clause. Certiorari was granted to consider whether the commerce clause prevented the city of Boston from giving effect to an executive order by the mayor and the judgment was reversed. The United States Supreme Court did not review that portion of the opinion based upon the privileges and immunities clause. *White* v. *Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 206 (1983).

The court also employed this pattern in upholding a challenge to the constitutionality of our rule that an attorney seeking admission to the bar on motion must be a resident. *Matter of Jadd,* 391 Mass. 227 (1984). See also *Matter of Gordon,* 48 N.Y.2d 266 (1979) (statute prohibiting admission to the bar absent proof of six months' residence violates clause).

restating the purpose of the clause, indicated that it "is to outlaw classifications based on . . . noncitizenship unless there is something to indicate that noncitizens constitute a peculiar source of the evil at which the statute is aimed." *Id.* at 398. The *Hicklin* Court intertwined the concepts and stated that "[a] 'substantial reason for the discrimination' would not exist . . . 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil . . . .' " *Hicklin* v. *Orbeck, supra* at 525, 526.

We now consider whether there is a substantial reason for the discrimination beyond the fact of residence in another State. We have before us no record of legislative findings, indeed no factual record of any kind. The proposed statutory preference for Commonwealth residents, applicable to at least eighty per cent of the positions covered by a governed contract or subcontract, would be triggered by a finding by the Commissioner of Labor and Industries (commissioner) that critical unemployment conditions exist in an employment area and that employment opportunities for Commonwealth residents "are decreased due to the employment of nonresidents . . . in that area . . . ."[4] It can be argued that the resulting preference or discrimination is obviously based solely on nonresidence. Nevertheless, the Supreme Court has not terminated its review at this point. In determining whether there was a "substantial reason for the discrimination," the *Hicklin* Court looked to whether noncitizens were a "peculiar source of the evil" (and concluded that no such showing had been made on the record). *Hicklin* v. *Orbeck, supra* at 525-526. The Court in the *United Bldg.* case clearly sought to consider Camden's justification, but found it impossible to do so on the record. *United Bldg. & Constr. Trades Council* v. *Mayor of Camden, supra* at 223. In following this pattern we will assume that a finding by the commissioner might, in

---

[4] The bill defines "[c]ritical unemployment conditions" as "the occurrence of a rate of unemployment within an employment area . . . which is equal to or greater than one hundred and twenty percent of the average rate of unemployment in the commonwealth or in the United States, whichever is lower, during the same period."

certain circumstances, show that nonresidents are a "peculiar source of the evil."[5]

If we assume that a substantial reason beyond nonresidence were shown, the question at issue would then become that of determining whether the degree of discrimination bears a close relationship to that reason.[6] We have no assurance that the magnitude of the preference (eighty percent of governed positions) would bear a close relationship to the reason justifying the discrimination. Moreover, all Massachusetts residents, without regard for whether they lived in the subject employment area and no matter what their employment status, education, training, or experience, would have the benefit of the preference. No distinction is made between residents who do and do not live in the area at issue or between those who are employed and those who are unemployed or are in employment training programs. The *Hicklin* Court, in reviewing a statutory preference for all Alaskans for all covered positions, stated that the means by which the State sought to reduce its level of unemployment "must be more closely tailored to aid the unemployed the Act is intended to benefit." *Hicklin* v. *Orbeck, supra* at 528. Although the preference before us is not so widely drawn, we nevertheless consider that comment to be instructive. Preferring employed residents would not directly serve to reduce unemployment in an area, although it could serve to increase employment opportunities for some persons. Nevertheless, the degree of discrimination must bear a close relationship to the justification. The emphasis in the bill on em-

[5] There is no assurance that the finding will not be merely conclusory. It is possible that the unemployment rate in an area may vastly exceed the percentage of positions held by nonresidents, and that the types of positions held by nonresidents may be different in nature from those for which Massachusetts residents are both available and appropriately trained. It is also possible that employment of nonresidents might be the result of such factors as too few trained applicants in the local labor force rather than the cause of unemployment in the local area, so that the level of local unemployment may not be directly related to the employment of nonresidents. In short, a conclusory finding might not show that nonresidents are a "peculiar source of the evil."

[6] The *Hicklin* Court spoke of a "reasonable relationship" (*id.* at 526), but this is not necessarily part of the *Toomer* standard.

ployment areas and critical unemployment conditions suggests the expectation that it will be of particular assistance to the unemployed. We conclude that even if we assume that a substantial reason, beyond nonresidence, were shown to justify the discrimination, the degree of discrimination would not bear a sufficiently close relationship to that reason (presumably based upon the finding required by the bill that "employment opportunities for . . . residents are decreasing due to the employment of nonresidents").[7] As a result, we conclude that the bill would violate the privileges and immunities clause of the United States Constitution.

Our conclusion is consistent with those reached in other jurisdictions. The Washington Supreme Court held that a requirement in all contracts let by the State or any county or city for certain projects that the contractor or subcontractor must employ either ninety-five or ninety percent residents violated the clause. *Laborers Local 374* v. *Felton Constr. Co.,* 98 Wash. 2d 121 (1982). A New Jersey court, reviewing a requirement that preference be given to residents in certain construction contracts awarded by the State or other public bodies, determined it to be in conflict with the clause. *Neshaminy Constructors, Inc.* v. *Krause,* 181 N.J. Super. 376 (1981). In addition, a New York statute mandating preferential employment of residents on public works projects was held to be a violation of the clause. *Salla* v. *County of Monroe,* 48 N.Y.2d 514, 518 (1979), cert. denied sub nom. *Abrams* v. *Salla,* 446 U.S. 909 (1980) (focusing, in part, on the absence of a "unique link between the interest served and the discrimination practiced").

We next consider whether and to what extent the Commonwealth's proprietary interest in State-funded contracts may render the discrimination nonviolative of the clause. The bill would apply to State-funded projects and the preference requirement would be applicable to contracts and subcontracts. In contrast, the statute at issue in *Hicklin* applied "to all employ-

---

[7] See also *Rubin* v. *Glaser,* 83 N.J. 299, 305-306 (1980), and *Lung* v. *O'Chesky,* 94 N.M. 802, 804 (1980), in which the relationships were found to be sufficiently close.

ment which is a result of oil and gas leases . . . ." *Id.* at 529. The Court stated that it included employers who had no connection with the State's oil and gas, performed no work on State land, had no contractual relationship with the State, and who received no payment from the State. *Id.* at 530. State ownership of the property was not dispositive because Alaska had little or no proprietary interest in much of the encompassed activity and much of the activity was "sufficiently attenuated" that it could not "justifiably be the basis for requiring private employers to discriminate against nonresidents." *Id.* at 529. The impact of the bill at issue would not be that extensive, so the *Hicklin* determination that ownership was an insufficient justification for the pervasive discrimination is informative but not dispositive. Thus, the question remains, whether the Commonwealth's proprietary interest insulates the discrimination. We have also considered the Court's review of this issue in the *United Bldg.* case wherein the Court acknowledged that the fact that Camden was expending its own funds was a factor and perhaps the crucial factor to be considered; and then sought to apply the *Toomer* standards to the city's justification (concluding that it would not do so on the record before it). *United Bldg. & Constr. Trades Council* v. *Mayor of Camden, supra* at 222-223. From this review, we know that the Commonwealth's interest in the expenditure of State funds is a factor to be evaluated and that we must again look to whether the degree of discrimination bears a close relationship to the justification.[8] We have already determined that the magnitude of the discrimination does not bear the requisite relationship to the rationale. We also conclude, for the same reason, that the Commonwealth's interest in assuring that its limited resources are preserved for the benefit of its residents would not preclude the bill's violating the clause.

In *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston,* 384 Mass. 466, 477-478 (1981), the court rejected a contention that the absolute employment preference

---

[8] The strength of the proprietary interest argument is reduced if, as the bill would permit, the "State-funded project" were financed only in part by Commonwealth funds.

might be justified under the clause by the Commonwealth's role as a market participant. A different result is not warranted by the terms of the pending bill. See also *United Bldg. & Constr. Trades Council* v. *Mayor of Camden, supra.*

We have sought to fulfil our responsibility to conduct this inquiry with an appropriate regard for the principle that the Commonwealth "should have considerable leeway in analyzing local evils and in prescribing appropriate cures." See *Toomer* v. *Witsell, supra* at 396. We recognize this leeway as being an essential component of our Federal system. Nevertheless, we have also been guided by the underlying purpose of the privileges and immunities clause. We have sought to discern the appropriate relationship between such constitutional values as protection of nonresidents and respect for State autonomy.

For the reasons set forth above, we conclude, and in response to question 1 state, that the bill would, if enacted into law, violate the privileges and immunities clause, art. 4, § 2, cl. 1, of the United States Constitution. As a result, we beg to be excused from answering the remaining question.

The foregoing opinion and answer is submitted by the Chief Justice and the Associate Justices subscribing hereto on the 4th day of October, 1984.

EDWARD F. HENNESSEY
HERBERT P. WILKINS
PAUL J. LIACOS
RUTH I. ABRAMS
JOSEPH R. NOLAN
NEIL L. LYNCH
FRANCIS P. O'CONNOR