STEPHEN ABRAMOWITZ, INDIVIDUALLY; REMUS REALTY CORP., A NEW JERSEY CORPORATION D/B/A ARCORP PROPERTIES; NATIONAL BRANDS OUTLET OF SECAUCUS, INC., A NEW JERSEY CORPORATION D/B/A N.B.O., THE NEW JERSEY CITIZENS FOR SUNDAY SHOPPING, AN ASSOCIATION NOT-FOR-PROFIT, AND BERTE INCORPORATED, A NEW JERSEY CORPORATION D/B/A BODY WORX, PLAINTIFFS, v. IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND THOMAS F.X. SMITH, CLERK OF THE CITY OF JERSEY CITY, DEFENDANTS.

Superior Court of New Jersey
Law Division Hudson County

Decided November 9, 1984.

*Joseph E. Irenas* and *William T. Reilly* for plaintiffs (*McCarter & English,* attorneys).

*Andrea M. Silkowitz* for defendant Irwin I. Kimmelman (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*Joseph Healy* for defendant Thomas F.X. Smith.

*Christopher L. Patella* for *amicus curiae* Hudson Merchants' Council (*Patella & Plaia,* attorneys).

CASTANO, J.S.C.

This is an action in lieu of prerogative writs challenging the constitutionality of a recent amendment, *L.* 1984, *c.* 160, to the Sunday Closing Law, *N.J.S.A.* 2A:171–5.8. The amendment grants to cities of the first class, in any county where Sunday sales are banned,[1] the opportunity to hold a municipal referendum to determine whether such sales should be permitted in that city despite the county-wide prohibition.

Until the amendment, the option to stay open or to close uniformly was determinable in the State on a county-wide basis only. Since the amendment does not do away with county-wide referenda even in those counties in which cities of the first class are located, the citizens of the first class cities are now given two opportunities to vote on the issue. The citizens of the other municipalities in the same counties still have only one.

Plaintiffs contend that, as a consequence, the statute as amended offends constitutional "equal protection" safeguards in several respects. The say that (1) it erodes the fundamental right to vote by producing inequality in the voting power of residents of first class cities and residents of other municipali-

---

[1] There are at present only two cities of the first class in New Jersey, Newark and Jersey City. Hudson County has adopted Sunday closing by referendum; Essex County has not. Therefore, at present the amendment applies only to Jersey City.

ties in the same county, (2) it creates a classification which bears no relationship to the purpose of the law, and (3) it is special legislation. I disagree. While obviously some disparity in treatment results, as it inevitably does whenever any classification is made, any imbalance here does not rise to the level of constitutional infirmity. The classification is neither arbitrary nor capriciously exclusive.

## I

The action was instituted pursuant to *R.* 4:69-1 but with a verified complaint and order to show cause which sought an interlocutory injunction to prevent the City Clerk of Jersey City from placing the newly-created municipal referendum on the ballot in the general election of November 6.

The original plaintiffs were Stephen Abramowitz, a resident of Secaucus; Remus Realty Corp., a developer of a large tract of property in Weehawken and West New York; the New Jersey Citizens for Sunday Shopping, an association comprised of approximately 175 retail establishments organized for the specific purpose of repealing the Sunday closing laws in Hudson and Bergen counties, and National Brands Outlet of Secaucus.

Abramowitz and Berte Incorporated withdrew as plaintiffs before the evidential hearing and Kathleen Biggiani, a resident of North Bergen, was added as a plaintiff to avoid any issue as to standing.

Before election day, Assignment Judge Burrell Ives Humphreys denied the injunctive relief in an extensive bench opinion in which he found that the plaintiffs had not established a reasonable likelihood of success on the merits, a balance of equities in their favor, an urgent necessity or irreparable harm. Both the Appellate Division and the Supreme Court denied plaintiffs' motion for leave to appeal.

The referendum, therefore, remained on the ballot and the voters in Jersey City on November 6 elected to repeal Sunday closing in their municipality by a 38,340 to 13,437 margin.

The following day this court heard argument on summary judgment motions of the defendants and also conducted a plenary hearing on the only evidentiary issue. The matter was treated in a summary fashion because, unless a court intervenes, Jersey City merchants automatically will be able to open their doors on Sunday, November 18, nine days hence. *N.J. S.A.* 2A:171-5.15.

Except for the issue of whether Jersey City is distinguishable demographically or socio-economically from the other municipalities in Hudson County, the critical facts are not in dispute. In fact, the parties submitted an extensive stipulation of census and fiscal data which has been incorporated into this opinion.

II

Pursuant to *N.J.S.A.* 2A:171-5.8, Sunday closing in New Jersey has been governed by county referenda since 1959.

In all counties except Hudson and Bergen, the voters have chosen to do away with the ban. In Hudson, the decision to stay closed has been reiterated several times over the years and was most recently confirmed in the November 1980 general election by a margin of 72,152 to 66,974.

The issue then remained dormant until June of this year when two identical bills on the subject were introduced in the Senate and the Assembly. Under both, Sunday sales would have been permitted without prior referendum approval in any regional shopping mall constructed pursuant to a redevelopment agreement in any city of the first class within a county in which Sunday sales were otherwise prohibited.

The statement to each bill indicated that its purpose was to attract large shopping malls to cities of the first class to "create much needed employment opportunities for residents and increase city tax revenues." Supposedly they were intend-

ed to exempt from the provisions of the Sunday Closing Law a regional shopping mall scheduled for construction as part of a commercial development project in Jersey City.

On June 28, one of the bills (*Assembly Bill* 2297) was passed in the Assembly and in the Senate under an emergency resolution. However, on September 13, Governor Kean returned the bill without his signature, noting that it would have affected only one regional shopping mall constructed or to be constructed, the one in Jersey City. The governor said that the advice of his legal counsel was that the bill was unconstitutional, presumably because it made a single exception to the referendum requirement.

On September 20, two other bills, *Senate Bill* 2243 and *Assembly Bill* 2607, were introduced and passed in both houses under emergency resolutions. Those bills, unlike their predecessors, provided for referenda. On October 1, the senate bill was signed by Governor Kean and thereupon became effective immediately as *L.* 1984, *c.* 160. Jersey City took steps directly to put the referendum on the ballot for the general election and this action followed.

### III

The constitutionality of the county-wide option has been settled in New Jersey since 1960, *Two Guys from Harrison, Inc. v. Furman*, 32 *N.J.* 199 (1960), and is not in issue here.

The city option, however, raises issues not addressed before which require that the amendment be examined both independently and in relation to the statute as a whole. Each approach raises different questions.

When the amendment is considered alone, plaintiffs argue that it is special legislation and that the classification it embodies is unreasonable. *N.J. Const.* (1947), Art IV, § 7, pars. 7 and 9 (8). *U.S. Const.* Amend. XIV; *N.J. Const.* (1947), Art. I, § 5.

■ Although different constitutional provisions are invoked in support of each of those arguments, the standard by which constitutionality is to be gauged is essentially the same for both. *Robson v. Rodriquez*, 26 *N.J.* 517, 526 (1958). In either event, three inquiries must be made: (1) does the purpose and subject matter of the statute bear a reasonable relationship to a legitimate governmental objective? (2) Is the classification reasonable, given the purpose of the statute? (3) Are any persons who should be included excluded from the class? *Jordan v. Horsemen's Benev. & Proctect. Ass'n*, 90 *N.J.* 422, 432–433 (1982); *Rubin v. Glaser*, 83 *N.J.* 299, 309 (1980), app.dism. 449 *U.S.* 977, 101 *S.Ct.* 389, 66 *L.Ed.*2d 239 (1980).

■■ The inquiries must be conducted with the caveat in mind that a statute is presumed to be constitutional and that a court should exercise sparingly the power to declare it unconstitutional. *Paul Kimball Hosp. v. Brick Tp. Hosp.*, 86 *N.J.* 429, 447 (1981); *Gangemi v. Berry*, 25 *N.J.* 1, 10–11 (1957). The "judicial task is to decide 'whether there is any conceivable state of facts bearing a reasonable relation to the object of the act which affords a basis for the classification.'" *Jordan v. Horsemen's Benev. & Protect. Ass'n, supra*, 90 *N.J.* at 433. The opponents must produce proofs which preclude the possibility of rationality. *See Hutton Pk. Gardens v. West Orange Town Council*, 68 *N.J.* 543, 564–565 (1975).

## A.

Within those bounds I proceed to the first inquiry which in this case actually is two-fold in nature: is Sunday shopping an appropriate subject matter of governmental regulation? If so, is there also a legitimate governmental concern which justifies excepting cities of the first class from a county-wide ban?

The answer to the first question was sketched out at length in *Two Guys from Harrison, Inc. v. Furman, supra*, 32 *N.J.* at 205–211, and need not be repeated here. "Blue laws" were sanctioned there.

■ As to the second question, a statement attached to *Assembly Bill* 2297 declares that:

... the *uniqueness* of cities of the first class and the *magnitude* of their economic problems, requires that the residents be allowed to decide the question of Sunday sales themselves, rather than have it decided for them by the voters of other municipalities within the County that have long ago divorced themselves from the problems of these large urban centers. [Emphasis supplied]

No one today can seriously dispute that the economic well-being of this nation's large cities is an appropriate subject matter for governmental concern.

Given the appropriateness of the subject matter of both the original statute and the amendment, the legislative purpose becomes the yardstick by which the next two inquires are measured.

### B.

■ Cities are classified as cities of the first class if they have a population of more than 150,000 by the most recent federal decennial census, *N.J.S.A.* 40A:6–4. At present, only Newark and Jersey City fall into that category. Obviously then, they are truly unique.

Jersey City's population constitutes 40% of the total population of Hudson County and is three times as large as the population of Bayonne, the next largest municipality in the county. There is no other municipality in the county whose population exceeds 12% of the county's total population.

The amendment's statement of purpose, however, speaks not simply of magnitude, but of magnitude of economic problems. Those are best illustrated by the fiscal and census data which was made part of the record.

Although eight municipalities in the county have been designated as urban aid municipalities eligible for additional funding under *N.J.S.A.* 52:27D–178 *et seq.*, Jersey City in each of the past five years has received more than five times the amount of monies distributed to any of the other seven. Its share in those

years represents 65.6% of all the Urban Aid money distributed to Hudson County municipalities.

Jersey City also receives annually 40.7% of all safe and clean neighborhoods money distributed to the county. Additionally, in 1984, it received $8,643,000 in community block grant funds under the Housing and Community Development Act of 1974, while all the other municipalities received a combined total of $8,852,000.

Over the past four years, Jersey City's unemployment rate has remained steadily at least 1.5 points above the county as a whole. According to the 1980 census it also has, in comparison to any other municipality in the county, more than four times as many persons whose incomes fall below poverty level, more than four times as many families below the poverty level with minor children, more than five times as many households receiving public assistance, more than seven times as many persons disabled from work, more than five times as many households headed by females, and more than five times as many unemployed high school dropouts between the ages of 16 and 19.

Moreover, a 1978 survey estimated that approximately 26,400 of Jersey City's housing units, or 30%, were then in poor to fair condition. No other municipality in the county has that many housing units in total.

At the trial, there was testimony that there are 15 major developments now under way in Jersey City as it struggles for economic revitalization. Three of them, it was said, would benefit from Sunday opening. It was suggested that one might not leave the drawing board without it.

With information such as this presumably before it, it was not unreasonable or irrational for the Legislature to extend to cities of the first class the right to hold a referendum to determine whether Sunday sales should be permitted within their borders. That is especially apparent when one considers that nine of the counties who already have that right under the

original statute are smaller in size and, one can assume, have smaller economic problems than either Jersey City of Newark.

In my view, the amendment was not the product of invidious legislative favoritism. It passes the second test.

### C.

The testimony produced at trial was largely aimed at the third inquiry which a reviewing court must make.

Plaintiffs attempted to establish that in terms of economic problems Jersey City is indistinguishable from other municipalities in the county, that Hoboken, Union City, West New York, North Bergen and others are beset by the same difficulties. Consequently, they argue, there was no rational basis for excluding them.

The contention, however, overlooks the critical criteria of sheer size. There was no evidence before me, for instance, of any developmental plans of the numerical magnitude of those in Jersey City in any of the other Hudson County municipalities.

Plaintiffs' expert tried to circumvent the size problem with testimony that from the standpoint of density of population the problems of the other municipalities are proportionately just as acute. That may be so and may be a good argument to address to the Legislature in the future, but it in no way undermines the rationality of excluding all but first class cities form the statutory scheme. "[I]t is not enough to demonstrate that the legislative objective might be more fully achieved by another more expansive classification for the Legislature may recognize degrees of harm and hit the evil where it is most felt." *New Jersey Restaurant Association v. Holderman,* 24 *N.J.* 295, 300 (1957).

Plaintiffs have not established to my satisfaction that any of the other municipalities which are excluded should have been included and they have not overcome the presumption that *L.* 1984, *c.* 160 is constitutional when considered by itself.

## IV

Even if the amendment is deemed to be constitutional when considered in isolation, plaintiffs argue that in its interrelation with the pre-existing statute it operates to dilute the voting power of the citizens of all the other municipalities in those counties where cities of the first class are located. That, they say, is a major constitutional flaw.

The critical significance of the argument is that if this court were to agree that fundamental voting rights of non-Jersey City county residents are in fact in any way diminished by the amendment, *L.* 1984, *c.* 160 would lose its presumption of validity and instead would have to be subjected to "exacting judicial scrutiny." The considerably stricter standard of review is extracted from *Kramer v. Union Fire School District No. 15*, 395 *U.S.* 621, 89 *S.Ct.* 1886, 23 *L.Ed.*2d 583 (1969).

Plaintiffs suggest that two hypotheses support their argument. Under one, citizens of the first class cities will exercise their newly-created opportunity to bestow upon themselves an economic advantage and then in a county referendum will withhold the same advantage from their neighbors; that is, they will vote to open in the city and then vote to close in the county.

Under the second hypothesis, the amendment is deemed to create 23 districts (the 21 counties and the two first class cities). In 19 of those districts (those counties which have no first class cities), the vote of all in the county is equal, but in the other two it is not, it is claimed.

Plaintiffs point out that in Hudson County, where Jersey City has already voted to stay open, the non-Jersey City municipalities are the only municipalities whose "blue laws" destiny will be at issue in the next county referendum. Yet, Jersey City voters, who will be totally unaffected by the outcome, will have the opportunity to vote on the issue and perhaps decide it. The

voting power of the non-Jersey City citizens will be seriously diluted, it is argued.

From those hypotheses plaintiffs conclude that the amendment, together with the original statute, creates three classes of separate, but unequal voters: (1) Jersey City voters who favor Sunday sales within their municipalities; (2) Jersey City voters who oppose Sunday sales, and (3) citizens of the other municipalities in the county.

The argument is contrived and faulty because what the amendment has created are not three classes of voters, but two elections. Plaintiffs' first and second classes are not really classes. They are merely descriptions of two preferences of voters in one class.

The act and the amendment merely provide the opportunity for two separate elections in those counties which include within their boundaries a city of the first class. There may be a municipal election which will involve a municipality alone and in which only citizens of that municipality may participate. There may also be a county wide election which will involve citizens of all the municipalities in the county, including those who may live in first class cities. In each election, all who vote will have an equal vote, no matter what their preference.

There is no dilution and no "preferred class of voters." *Reynolds v. Sims*, 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506 (1964). Therefore, the presumption of validity abides.

## V

■■■ Plaintiffs also argue that certain minor variations between the provisions of the original Sunday Closing Law and the amendment render the act constitutionally infirm. For example, *N.J.S.A.* 2A:171–5.6 provides for resubmission of the question after county-wide approval, while the amendment does not provide a similar mechanism. *N.J.S.A.* 2A:171–5.17 provides that the clerk of the county must receive a petition for resubmission after a referendum's defeat by the 45th day

before the next general election, while *N.J.S.A.* 2A:171–5.18 prohibits such resubmissions within three years of the date of the election at which it was last presented to the voters. The amendment allows a petition to be submitted to the county clerk 30 days prior to the next general election and permits resubmission annually.

 Every classification of persons and things for regulation produces dissimilarities. To nullify an enactment, the variations must be unreasonable and arbitrary. The foregoing are not.

Plaintiffs' challenge to the constitutionality of *L.* 1984, *c.* 160 is rejected. Judgment will be entered for defendants.

